UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

DR. RAYNOR MULLINS,    )
    )
    Plaintiff,    )
    )    No. 5:17-CV-319-REW-CJS
v.    )
    )
STEPHANOS KYRKANIDES,    )    OPINION AND ORDER
Individually and in his Official Capacity    )
as Dean of the University of Kentucky    )
College of Dentistry,    )
    )
    Defendant.

*** *** *** ***

Defendant Stephanos Kyrkanides, in both his individual capacity and his official capacity as Dean of the University of Kentucky College of Dentistry ("UKCOD"), moves for summary judgment on Plaintiff Dr. Raynor Mullins's First Amendment retaliation Complaint brought under 42 U.S.C. § 1983. DE #44. The motion is fully briefed (DE ##49, 50), with extensive citations to the lengthy record. Summary judgment practice is not about fact-finding, but rather assessing whether there are material facts in genuine dispute to be resolved via trial. Here, the epic story of academic intrigue and the place of free speech at the UKCOD, involving contested interactions between Dr. Mullins, Dean Kyrkanides[1], and others, requires a trial. The Court does not pick between reasonably supported versions, and a jury will decide what actually happened. Except as to a limited part, the Court **DENIES** the motion for summary judgment.

---

[1] The Dean arrived at the UKCOD in 2015 at the start of the academic year. *See* DE #49-13 (Kyrkanides Dep.) at 24–25. He was new to the Commonwealth, having held prior posts in the Department of Dentistry at the University of Rochester and the School of Dental Medicine at Stony Brook University, both in New York. *See id.* at 13–15.

## FACTUAL AND PROCEDURAL BACKGROUND

The record in this case, fully audited by the Court, is extensive and replete with disagreements as to particular events and personal motives. Some of these disputes concern material facts ultimately necessary for resolution of the central issues. For purposes of ruling on Kyrkanides's summary judgment motion, the Court, as it must, views the record and draws reasonable inferences in favor of Plaintiff and his version of events, as detailed in his First Amended Complaint (DE #30) and summary judgment response (DE #49).

Mullins is a public health dentist, who served as a member of the UKCOD faculty in various capacities from the completion of his residency in 1974 until his contract's lapse in the summer of 2017. DE #30 ¶ 1–7. Beginning in 2008, Mullins served in a post-retirement capacity as a member of the UKCOD's Emeritus Faculty. *Id.* at ¶ 9; DE #44-3 (Mullins's Post-Retirement Appointment); DE #49-8 (Mullins Dep.)[2] at 19. His employment, at least in the 2016–17 academic year, relied on grants awarded to the UKCOD. DE #49 ¶ 2. Mullins's spot typically hinged on grant funding.[3] *See id.* at 1–3. However, he had been in the post-retirement post for approximately nine cycles, and during that time had been on several different grants and on some non-grant funding at times. *See* DE #49-8 at 27–33. Notably, the formal appointment paperwork does not list a grant-funded contingency. *See* DE #44-3. Mullins described his post-retirement role at the University as follows: "It was full-time research. I had minimum, I would say less than five

---

[2] All citations to deposition transcripts refer to the CM/ECF pagination.

[3] While Mullins states that his post-retirement position was largely grant-funded during the period he held it, he "disputes that his continued employment with the UKCOD was *conditioned on* continued grant funding." DE #49 at 2 (emphasis in original); *accord* DE #49-8 at 33–36. Kyrkanides, arguing that Mullins was in fact aware that his continued employment was contingent on grant funding, cites to a 2013 email in which Mullins outlined his anticipated work breakdown for the 2013-14 academic year and stated: "I, of course, fully understand this is contingent on grant funding." DE #44-7 at 1. Mullins maintains, however, that this statement pertained only to funding for the 2013-14 academic year and does not reflect his expectations as to future employment.

percent, administrative responsibilities. I had a few teaching assignments but very few. And I worked part-time with the [S]enate on major initiatives . . . [M]y primary role was to help build the research partnerships in rural Kentucky." DE #49-8 at 17–18.

On approximately June 22, 2016, Kentucky Governor Matt Bevin announced a plan to alter Kentucky's Medicaid program called the "Kentucky HEALTH Waiver Proposal" (hereinafter "the Medicaid waiver" or "the waiver"). DE #30 ¶ 11. UK assigned Vice President for Administrative & External Affairs for UK HealthCare Mark Birdwhistell to work closely with the Governor's Office to design the waiver proposal. *Id.* at ¶ 12; DE #49-8 at 76. Part of the waiver plan would have eliminated or reduced dental coverage for the Kentucky Medicaid population; Mullins, who had a long history of dealing with underserved populations in the state, took a dim view of the changes.

Mullins promptly intimated to Kyrkanides his concerns about the new waiver proposal. This included copying Kyrkanides on an initial reaction email. *See* DE #44-13. Then, "in a brief unplanned hall encounter . . . before Defendant left for a summer vacation in Greece," Kyrkanides allegedly told Mullins to "stay 'off radio'" with respect to the waiver, and that this direction came from "up top." DE #30 ¶ 14–15; *see also* DE #49-8 at 109–110. Mullins took this conversation to indicate that Kyrkanides, with support from and at the direction of UKCOD officials and the Governor's Office, wanted him to remain silent regarding his opposition to the waiver proposal. DE #30 ¶ 16. Mullins told Kyrkanides that, while he had not received any media requests yet, he planned to submit public comments opposing the waiver proposal. *Id.*; DE #49-8 at 109.

On or about July 12, 2016, during the open period for submission of public comments on the waiver, Mullins, together with four other concerned dentists, submitted public comments critical of the waiver proposal. DE #30 ¶ 17; DE #44-14 (Comments). The comments explicitly

issued in the individuals' personal capacities as citizens and were not representative of the UKCOD. DE #44-14 at 12. However, while Kyrkanides was in Greece on vacation, he received a phone call from (or prompted by) someone in the Bevin administration concerning Mullins's public comments. DE #30 ¶ 21; DE #49-12 (Cunningham Dep.) at 14–15; DE #49-9 (Raybould Dep.) at 22; DE #49-6 ¶ 6 (Ebersole Aff.). The contrast in versions here is stark. Kyrkanides claims to have had no idea of the comments' tone or content and not to have cared a whit: "Whatever the comments are, it's fine with me." DE #49-13 (Kyrkanides Dep.) at 172. While the Dean describes himself as fully supportive of Mullins's right to comment, *id.*, those he interacted with following the Greece vacation described things quite differently. *See, e.g.*, DE #49-6 (Ebersole Aff.) ¶ 6 (recalling Kyrkanides telling him that "while on vacation in Greece, he [Kyrkanides] had received a call from Dr. Mark Birdwhistell in Frankfort concerning our Medicaid waiver comments, and that the signees . . . were aggravating the Governor's waiver process and . . . it was causing a problem for him and the College"); *accord* DE #49-9 (Raybould Dep.) at 29–30; DE #49-12 (Cunningham Dep.) at 14–15. There is plenteous evidence of a strong negative reaction by Kyrkanides. Mullins maintains that Kyrkanides's attitude and behavior toward him shifted and deteriorated from this point forward.

In mid-August 2016, Mullins and Kyrkanides had what Mullins characterizes as a chance meeting in the office of UKCOD's Dr. Greg Zeller, where they briefly discussed Plaintiff's public comments; Mullins alleges that, at this meeting, Kyrkanides urged him to "get off radar" with respect to the waiver proposal. DE #30 ¶ 23; DE #49 at 8–9; DE #49-8 at 101, 143. Mullins took this statement to mean he should remain silent regarding his opposition to the waiver. Mullins also alleges that, around this time, Kyrkanides stated at a meeting at which Mullins's supervisors and colleagues were present, but Plaintiff was not, that Mullins "ha[d] to go." DE #30 ¶ 26; *see* DE

#49-9 at 21–22 (Dr. Raybould testifying to and confirming Kyrkanides's statement that "Raynor has got to go."). On approximately August 24, 2016, Mullins states that Dr. Raybould informed him of Kyrkanides's comments at the meeting, which he memorialized in his notes from that conversation. DE #30 ¶ 27; *see* DE #49-11 (Mullins's August 24, 2016 meeting notes). Department Chair Dr. Cunningham confirmed that, on the day after Kyrkanides announced to Dr. Raybould that Mullins had "to go," the Dean definitively communicated to him and others that Mullins was "not to be involved anymore" in public health for the UKCOD. *See* DE 49-12 (Cunningham Dep.) at 17–18.

Thus, at this time, per one reasonably supported version, Dean Kyrkanides not only had warned Mullins to stay "off radar," he had explicitly told Mullins's supervisor and Department Chair that Mullins was to be let go. This included a direct statement to Dr. Raybould and a direct statement to Dr. Cunningham. DE #49-12 (Cunningham Dep.) at 17 (describing Kyrkanides as "very clear" in stating "Dr. Mullins needed to—you know, not be involved anymore."); *see also* DE #49-6 (Ebersole stating that Kyrkanides instructed: "Dr. Mullins should be excluded from public health research projects at UK College of Dentistry in the future."). Per Raybould, the Dean expressed his unequivocal intent to end Mullins's employment and elicited help in framing up a plan to eliminate Mullins. *See* DE #49-9 at 21–23 ("And I was asked to figure out a way to have Raynor go."); *id.* at 23–24 (discussing meeting the next day, where Kyrkanides said "we have to formulate a plan on how to deal with Raynor" and interpreting that to mean "that he [Mullins] wouldn't be able to be employed at UK anymore, was my understanding").

On September 7, 2016, Mullins alleges that, during a formal meeting with Kyrkanides, the Dean expressed similar direct sentiments once again, warning Mullins to be "off the radar" and not "to piss the Governor off." DE #30 ¶¶ 28–33; *see* DE #49-8 (Mullins Dep.) at 147–53

(describing the September 7 meeting); *see also* DE #49-6 (Ebersole Aff.) at ¶ 7 (stating that Kyrkanides previously told him that he intended to "get Raynor Mullins 'off the radar' on this subject[].") Mullins again took these statements to indicate Kyrkanides's displeasure regarding his public comments on the Medicaid waiver. Mullins asserts that he did not meet or substantively communicate in person again with Kyrkanides after this September 7, 2016 meeting. DE #30 at ¶ 35; DE #49-8 at 50.

Mullins described the alleged September meeting in detail in his deposition. *See, e.g.*, DE #49-8 at 150, 152–53 (Mullins testifying that Kyrkanides did not deny he said "Raynor must go" when "confronted" at the September 7 meeting, but nevertheless describing the meeting as a "high-quality discussion" that left Mullins optimistic about his working relationship with the Dean going forward). His depiction dramatically differs from that of Kyrkanides. *Cf.* DE #49-13 (Kyrkanides Dep.) at 221–225 (testifying that he told Mullins he "came to Kentucky to do good things. If I lose my job over it . . . It's a risk I'm willing to take[,]" and that, despite having "begged" Mullins to stay, Mullins became "upset and furious" and "raised his voice.") Per Mullins, Kyrkanides, among other things, told Mullins he could have fired him for the Medicaid comments, warned him against aggravating the Governor's office, and implicated that Mullins must be quiet about the waiver. *See* DE #49-8 at 109, 142–43, 204–05; DE #49-15 (Mullins's September 7, 2016 Meeting Notes). In the meeting, Mullins elected to divulge to the Dean that Dr. Raybould had reported to him the Dean's intent to terminate Plaintiff at the College. *See* DE #49-15.

Mullins alleges that, beginning around this time and continuing until his departure from the UKCOD, Kyrkanides undermined Mullins's relationships with UKCOD colleagues and negatively interfered with his efforts to procure additional grant funding for the 2017–18 academic year, all of which Mullins believed to be in retaliation for his Medicaid waiver comments. DE #30

¶ 39; *see* DE #49-8 at 40–47. Plaintiff reports that he had some hope of reparation following the September 7 meeting, but an email chain the next week dashed most of that. The chain is a dense example of academic logomachy, but one rational take is that the emails show the Dean stirring up false dissension between Raybould and Mullins. *See* DE #49-18. Further, it is fair to infer that the Dean, who had prompted some of the inquiries or actions by Mullins, then used Mullins's involvement as a point of criticism. Eventually, in the chain, Kyrkanides essentially shut off further communications by telling Mullins to go through UKCOD hierarchy in the future. *See id.* at 1.

Several other record examples support Mullins's impression. Per Ms. Aalboe, a junior colleague and former division chair of Mullins, Kyrkanides took steps to alienate her from Plaintiff. *See* DE #49-7 (Aalboe Aff.) ¶ 6 ("I believed then, and believe now, that Dean Stephanos Kyrkanides was trying to undermine my professional relationship with Dr. Raynor Mullins."). Kyrkanides also specifically directed Aalboe not to work with or include Mullins on future projects. *Id.* at ¶ 8. The Dean made similar remarks to other UKCOD faculty. *See* DE #49-6 ¶ 9 (Ebersole Aff.) (stating that Kyrkanides instructed that Mullins was to be excluded from public health research projects going forward); DE #49-12 (Cunningham Dep.) at 17–19 (stating that Kyrkanides informed him that Mullins was not to be involved in particular grant projects going forward).

On January 17, 2017, Mullins received a certified letter informing him that his post-retirement appointment with the UKCOD would not be renewed for the 2017–18 academic year. DE #30 ¶ 47; DE #49-8 at 208–09. The letter justifies the nonrenewal on the following basis:

> Moreover, we are not aware of any effort on your behalf to apply for or to secure any grant or other external funding in connection to your position. It is also unfortunate that in the current budget climate it is not possible for the College to support your post-retirement position from other funding streams.

DE 49-3 (January 17, 2017 Termination Letter). The signatories attributed the letter to the Dean. *See, e.g.*, DE #49-12 (Cunningham Dep.) at 65 (confirming that "the Dean drafted it"). Per the record, the grants supporting Mullins in 2016–17 were, in fact, set to end. However, the accuracy of the letter's stated justification is subject to fair doubt. Mullins testified at length to his "effort" to secure additional funding. *See* DE #49-8 (Mullins Dep.) at 33–47 (listing grants and external funding sought). Further, the UKCOD budget seemingly might have afforded funding for the narrow commitment Mullins sought. Dean Kyrkanides himself suggested as much in his deposition. *See* DE #49-13 (Kyrkanides Dep.) at 281 (acknowledging the Dental Public Health department's "excess of revenues" and stating that "Dr. Raybould, should he want it, could have asked to utilize [it]"). As is typical in this record, Raybould and Cunningham had a very different view—they saw all funds as being in control of the Dean, and they rejected the notion that a Dean viewing Mullins as having "to go" would be receptive to continued funding for Mullins's position. *See, e.g.*, DE #49-9 (Raybould Dep.) at 104–05 (stating that the Dean controlled all position funding and made it "clear" that Mullins was not to be on the payroll); DE #49-12 (Cunningham Dep.) at 17–18 (recalling Kyrkanides's "definitive" communication that Mullins was not to be involved in public health research projects going forward).

Thereafter, in August 2017, Mullins filed this First Amendment retaliation action, originally against both Kyrkanides and Birdwhistell, in their individual and official capacities. DE #1 (Complaint). However, in April 2018, Mullins amended the Complaint to excise the claim against Birdwhistell. DE #30 (First Amended Complaint). Mullins's claim against Kyrkanides, in both his individual and official capacities, seeks both compensatory and punitive damages, as well as the injunctive remedy of reinstatement to his former position within the UKCOD.

# DISCUSSION

## I.    Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; see also *id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the

nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## II.     Official-Capacity Claim

Kyrkanides first argues that Mullins's official-capacity claim fails because (1) sovereign immunity bars it, and (2) § 1983 is inapplicable in the official-capacity context because "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" subject to liability. *Will v. Mich. Dep't of State Police*, 109 S. Ct. 2304, 2312 (1989). *See* DE #44 at 16.

### A.  Sovereign Immunity

The Eleventh Amendment shields states from suits "by citizens of another state[.]" U.S. Const. amend. XI. The related concept of sovereign immunity "prohibits suits against a state by one of its own citizens." *Cox v. Shelby State Cmty. Coll.*, 48 F. App'x 500, 504 (6th Cir. 2002). Mullins's claim against Kyrkanides in his official capacity as Dean of the UKCOD "is, in all respects other than name, to be treated as a suit against" the UKCOD. *Kentucky v. Graham*, 105 S. Ct. 3099, 3105 (1985). And, under "§ 1983, the University, as an arm of the State, is immune

from suit under the Eleventh Amendment" and sovereign immunity. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000). Kyrkanides, in his official capacity, cannot be liable to Mullins for monetary damages, "but may be subject to injunctive remedies." *Cox*, 48 F. App'x at 504.

Mullins seeks such injunctive relief—namely, reinstatement to his former position in the UKCOD. *See* DE #30 at 14 ¶ C. Where a plaintiff "has asked for the equitable and prospective remedy of reinstatement . . . [that] portion of [the] suit is not barred by the Eleventh Amendment" or sovereign immunity. *Cox*, 48 F. App'x at 504. Courts, therefore, must dismiss like official-capacity claims against university officials, "excepting only those claims praying solely for prospective injunctive relief." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 676 (6th Cir. 2001).

## B. The *Will* Doctrine

Kyrkanides casts the holding *in Will* as an alternate basis for dismissing the official-capacity claim against him, but it falls short of filling that role. The holding in *Will* primarily serves to extend the practical concept of Eleventh Amendment and sovereign immunity to official-capacity suits brought in state courts.[4] *Will*, 109 S. Ct. at 2308. And, despite the Court's conclusion that state officials are not "persons" subject to § 1983 liability in state courts, the decision carved out a significant caveat: "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 109 S. Ct. at 2312 n.10 (quoting *Graham*,

---

[4] The *Will* Court succinctly framed its sole inquiry: "Petitioner filed the present § 1983 actions in Michigan state court, which places the question whether a State is a person under § 1983 squarely before us since the Eleventh Amendment does not apply in state courts." *Will*, 209 S. Ct. at 2308. *See, e.g.*, *Maine v. Thiboutot*, 100 S. Ct. 2502, 2507 n.7 (1980) ("No Eleventh Amendment question is present, of course, where an action is brought in a state court[.]").

105 S. Ct. at 3106 n. 14). The present suit is in federal court, and Kyrkanides, officially, has availed himself of the applicable sovereign immunity defense, to the extent applicable to bar Mullins's claim; *Will* has no particular bearing on this situation.

Accordingly, the Court will grant summary judgment to Kyrkanides on the official-capacity claim, to the extent Mullins seeks monetary damages, *see, e.g.,* DE #30 at 14 ¶ A, but will preserve the official-capacity claim, to the extent Mullins seeks the prospective injunctive relief of reinstatement.

### III. Individual-Capacity Claim

Kyrkanides argues that Mullins's individual-capacity First Amendment retaliation claim fails to survive summary judgment for three sequential reasons: (1) Mullins cannot establish the elements of his *prima facie* case; (2) even if Mullins could establish them, Kyrkanides is entitled to qualified immunity; and (3) even if the Court finds that Mullins has established his *prima facie* case and also declines to grant qualified immunity, Kyrkanides has established that the UKCOD would not have renewed Mullins's contract regardless of his protected speech. DE ##44, 50. The Court evaluates each argument in turn.

#### A. *Prima Facie* Case

It is well-established "that private citizens have a First Amendment right to criticize public officials and to be free from retaliation for doing so." *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010). To state a First Amendment retaliation claim, Mullins must demonstrate that: (1) the First Amendment protects his speech; (2) he suffered an adverse employment action; and (3) there is a causal connection between his protected speech and the adverse action. *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 513–14 (2017) (citing *Savage v. Gee*, 665 F.3d 732, 738 (6th Cir. 2012)). Kyrkanides does not dispute that Mullins's comments on the proposed Medicaid

waiver, submitted in his capacity as a citizen during the public comment period, constituted protected First Amendment activity.[5] Kyrkanides does, however, dispute Mullins's ability to establish the second and third elements.

## 1. Adverse Employment Action

For purposes of a First Amendment retaliation claim, adverse employment actions are ones that "would chill or silence a 'person of ordinary firmness' from future First Amendment activities." *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (citation omitted). The conduct need not have actually deterred the plaintiff's speech, but the plaintiff must show that the actions were "capable of deterring" someone of ordinary firmness. *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007) (quoting *Thaddeus-X*, 175 F.3d at 398). A plaintiff must allege more than "de minimis threats or 'inconsequential actions,' but neither does the requisite showing permit 'solely egregious retaliatory acts . . . to proceed past summary judgment.'" *Id.* (quoting *Thaddeus-X*, 175 F.3d at 398). The phrase "adverse employment action" "traditionally referred to actions such as 'discharge, demotions, refusal to fire, nonrenewal of contracts, and failure to promote.' *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010) (quoting *Thaddeus–X*, 175 F.3d at 396). But, any action that would chill a person of ordinary firmness "will suffice, which may include harassment or publicizing facts damaging to a person's reputation[.]" *Id.*

---

[5] A First Amendment retaliation plaintiff, who is a public employee, must show that: (1) his speech touched on a matter of public concern; and (2) his interest in addressing the matter outweighed his employer's interest in efficient administration of public services. *See Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001), *cert. denied*, 123 S. Ct. 73 (2002); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist.*, 88 S. Ct. 1731 (1968). The defense does not contest these sub-elements.

The Court must tailor its analysis to the specific context and circumstances. *See Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005). Kyrkanides argues that, in the case of a grant-funded appointment, renewable on yearly bases, nonrenewal would not deter a public employee of ordinary firmness from exercising his First Amendment rights, where the employee was aware the supporting grants were ending and failed to secure additional funding. DE # 44 at 18–19; DE #50 at 3. Kyrkanides also maintains that the appointment could not have been renewed because Mullins intended to work only one or two days a week, at odds with continued paid employment in his current capacity. Further, Kyrkanides claims he wanted Mullins to remain with the UKCOD as a volunteer. DE #50 at 3. In effect, Kyrkanides represents that, essentially, he had no control over Mullins's departure and took no chilling action.

In arguing that Mullins's appointment naturally came to its close, Kyrkanides urges the Court to focus on whether Plaintiff had "some expectation of continued employment."[6] DE #44 at 18. He asserts that Mullins could not have had such an expectation, given the nature of the appointment, and Plaintiff's unsuccessful efforts to obtain grant funding. An expectation of continued employment is not a prima facie case element relative to First Amendment retaliation. A plaintiff's "lack of a contractual or tenure 'right' to re-employment for the [following] academic year is immaterial to his free speech claim." *Perry v. Sindermann*, 92 S. Ct. 2694, 2697–98 (1972). The Supreme Court has, in multiple instances, "specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First [] Amendment" rights. *Id.* at 2698.

---

[6] In support of this proposition, Kyrkanides relies upon *Webb v. Kentucky State University*, 468 F. App'x 515 (6th Cir. 2012). However, *Webb*'s determination that there was no adverse action hinged on the fact that the allegedly adverse events occurred *before* the plaintiff's allegedly protected activity, foreclosing any causal connection. Accordingly, the facts are inapposite to the present scenario, and *Webb* is unpersuasive.

The proper inquiry is not whether Mullins had an expectation his employment would continue, but rather whether Kyrkanides failed to renew him based on unconstitutional motives. "[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely," particularly including "constitutionally protected interests— especially, his interest in freedom of speech." *Id.* at 2697. The plaintiff's expectations are irrelevant to this equation. *See, e.g.*, *Adkins v. Bd. of Educ. of Magoffin Cty., Ky.*, 982 F.2d 952, 995 (6th Cir. 1993) (reaffirming that "[w]hile the plaintiff had no contractual right to a job, she could not be deprived of her public employment for exercising a constitutional right"). If Mullins's protected speech played a significant role in Kyrkanides's decision not to offer him another one-year paid contract there may be a First Amendment violation. The fact that Mullins's appointment was grant-funded and therefore conditional is thus not dispositive of whether Mullins suffered an adverse action when Kyrkanides declined to renew his contract.

The Court notes several other material things in dispute about this analysis. Mullins does not concede the fundamental grant-funding contingency, and the appointment documents contain no such explicit language. Although there is evidence to support that expectation, the fact that Mullins had been through nine cycles of the vagaries of funding supports his view that the funding plausibly would have been there in a normal environment. Further, the fact of nonrenewal is only part of the potential adverse action proof. Relatedly, Mullins points to Kyrkanides's causal role. Kyrkanides allegedly told several decision makers that Mullins had "to go" and would no longer be involved with the UKCOD. He also explicitly directed multiple faculty members to exclude Mullins from grant activities and, in the case of Aalboe, to stop communicating altogether with

Mullins.[7] *See* DE #49-7 ¶ 5 (Aalboe stating that Kyrkanides instructed her not to speak with Mullins); DE #49-12 (Cunningham Dep.) at 17 (describing Kyrkanides as "very clear" in stating "Dr. Mullins needed to—you know, not be involved anymore."); DE #49-6 (Ebersole stating that Kyrkanides instructed: "Dr. Mullins should be excluded from public health research projects at UK College of Dentistry in the future."). Ms. Aalboe flatly stated: "[The Dean] told me that Dr. Mullins was not to get any more grant funding." DE #49-7 ¶ 7.

The Dean allegedly attempted to introduce division between Mullins and Raybould. And Aalboe described Kyrkanides as "trying to undermine [her] professional relationship with Dr. Raynor Mullins." *Id.* at ¶ 6. The Dean allegedly reminded Mullins that he could be fired. The Dean was arguably duplicitous in his dealings with Mullins, facially (and falsely) touting his value to the team, but secretly ordering and pursuing a plan to end Mullins's tenure at the UKCOD. Defendant himself ceased communication with Mullins by mid-September 2016, having no substantive interaction with him after the mid-September inflammatory email chain. Kyrkanides also inaccurately communicated Mullins's employment plans in October of 2016 (without including Mullins on the communication). *See* DE #49-24.[8] Finally, Kyrkanides noted the presence of alternative funding and yet disclaimed any authority to access such funding to benefit Mullins,

---

[7] Courts have considered evidence of an employer's attempt to isolate an employee from colleagues in assessing the adverse action prong. *See, e.g.*, *Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1302 (11th Cir. 2005) (finding adverse action sufficient to survive summary judgment where, *inter alia*, "[Defendant] instructed [Plaintiffs'] coworkers not to talk with them[]" and attempted to "isolate them from their colleagues"); *see also Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1038–39 (7th Cir. 1998) (finding, under the more stringent Title VII retaliation standard, that ostracism by coworkers may constitute adverse action if directed or sanctioned by the employer).

[8] Mullins contests the accuracy of the Dean's summary email, claiming he "completely mischaracterized the nature of [their] meeting and [their] discussion[.]" DE #49-8 (Mullins Dep.) at 153.

a position directly opposite to that taken by the other involved administrators.[9] The termination letter contains justifications that are debatable on this record and can fairly be viewed as resting on reasons manipulable or strongly influenced by Kyrkanides himself. Simply put, viewing the evidence in Plaintiff's favor, a reasonable speaker confronting this collection of conduct would be chilled in the exercise of speech.

## 2. Causal Connection[10]

Whether Mullins's nonrenewal was "adverse action" and whether his speech motivated such action are closely related and somewhat interdependent considerations. Mullins must "show that the exercise of his First Amendment rights was a 'substantial or motivating factor' in the adverse action" to establish a causal connection. *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010) (defining this as but-for causation). To survive summary judgment, he "must

---

[9] Thus, Kyrkanides testified, "[I]t's in the hands of leadership such as Dr. Raybould and Dr. Ebersole to make it happen. If I have an objection, I'll raise it, but, please, deliver." DE #49-13 (Kyrkanides Dep.) at 218. Here, he attributes the funding power to Mullins's supervisors. *See also id.* at 219 ("I left it up to his supervisor and the head of research to make it happen."); *id.* at 271, 272 (noting other potential funding sources and saying, "[N]one of his other colleagues, such as Dr. Raybould or Jeff Ebersole are actually willing to support him."); *id.* at 281 (suggesting that Benton clinic surplus "was one that Dr. Raybould, should he want it, could have asked to utilize . . . . He has never come forward with a proposal for any – for Dr. Mullins."). Raybould, Cunningham, and (arguably) Ebersole each testified that Kyrkanides stated his intent to terminate Mullins. Each indicated that the Dean discouraged inclusion of Mullins on projects or grants going forward. Each viewed further money for Mullins as impossible, given the Dean's hard line. *See* DE #49-12 (Cunningham Dep.) at 17 (describing Kyrkanides as "very clear" in stating "Dr. Mullins needed to—you know, not be involved anymore."); *see also* DE #49-6 (Ebersole stating that Kyrkanides instructed: "Dr. Mullins should be excluded from public health research projects at UK College of Dentistry in the future."); *see also* DE #49-9 (Raybould Dep.) at 21–23 ("And I was asked to figure out a way to have Raynor go."); *id.* at 23–24 (discussing meeting the next day, where Kyrkanides said "we have to formulate a plan on how to deal with Raynor" and interpreting that to mean "that he [Mullins] wouldn't be able to be employed at UK anymore, was my understanding."). A jury must determine whether the Dean effectively thwarted Mullins's continued funding and thus continued employment.

[10] The Court addresses this element because of a stray line in DE #44, at 17, although the defense does not fully address the issue.

produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse action] would not have occurred but for his engagement in protected activity." *Id.* Such evidence can be direct or circumstantial, and it may include temporal proximity. *Id.* Further, "incidents of misconduct that do not rise to the level of an adverse employment action may be relevant at trial to show a pattern of mistreatment on the job based on plaintiff's protected activities" even preceding an adverse action. *Dye v. Office of the Racing Com'n*, 702 F.3d 286, 305 (6th Cir. 2012) (quotation marks and citation omitted).

Determinations as to motivation usually require factual evaluation, an ill fit for summary judgment. For instance, Mullins alleges that, prior to the public filing of his comments in July 2016, he expressed his concerns about the Medicaid waiver to Kyrkanides informally; Mullins states that Kyrkanides told him to stay "off radio" with respect to his opinions about the waiver, indicating that this direction came from "up top." DE #30 at ¶¶ 14–16; DE #49-8 at 109–110. Mullins took this statement as a warning not to speak publicly about the waiver. *Id.*

Mullins also presents evidence that Kyrkanides expressed disdain for Mullins's Medicaid comments again after Kyrkanides returned to the UKCOD following his July 2016 trip to Greece and subsequent August 2016 illness. *See* DE #49 at 9; DE #49-12 at 14–15 (Dr. Cunningham confirming his belief that the Governor's Office communicated "through Birdwhistell to the Dean while he was on vacation."); DE #49-9 at 21–22 (Dr. Raybould stating his belief that Kyrkanides received a phone call in Greece concerning displeasure with Mullins's comments). Further, Mullins plausibly supports the facial view that Kyrkanides expressed a desire to terminate Mullins because of the comments. *See* DE #49-6 at ¶ 7 (Dr. Ebersole stating that "Kyrkanides also told me at an August 2016 meting that he was told to get Raynor Mullins 'off the radar' on this subject"); DE #49-9 at 21–22 (Dr. Raybould attesting that Kyrkanides told him "Raynor has got to go"

following Mullins's comments); DE #49-11 at 2 (Mullins's August 24, 2016 notes recounting Dr. Raybould informing him that Kyrkanides had said "Raynor must go."); DE #49-12 (Cunningham Dep.) at 17 (describing Kyrkanides as "very clear" in stating "Dr. Mullins needed to—you know, not be involved anymore").

The Sixth Circuit has observed that "claims involving proof of a defendant's intent seldom lend themselves to summary disposition." *Center for Bio-Ethical Reform*, 477 F.3d at 823 (quoting *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998)). *See also Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997) (finding "inferences raised by the evidence of record ... sufficient to create a question of fact and avoid summary judgment" where they "reveal the possibility that ... [the defendant] did have a retaliatory motive"); *Cockrel*, 270 F.3d at 1056–57 ("[B]ecause plaintiff has established elements of her claim for First Amendment retaliation, summary judgment for defendants is proper only if the evidence is such that every reasonable juror would conclude that the defendants have met their burden."). The direct evidence of Kyrkanides's motive, as well as the corroborating circumstances, easily support a rational belief that Mullins's speech resulted in the adverse actions that followed the speech.

### B. Qualified Immunity

Qualified immunity shields government officials "performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known.'" *Nailon*, 715 F. App'x at 513 (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). Determining whether qualified immunity protects a public official is a two-step inquiry: (1) the Court must consider whether, viewing the facts in the light most favorable to the plaintiff, a constitutional violation has occurred; and (2) whether the violated right was clearly established at the time of the violation. *Id.*

(citing *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)). The plaintiff must establish both elements to overcome a defendant's assertion of qualified immunity. *Id.*

### 1. Constitutional Violation

The Court must first analyze the elements of the First Amendment retaliation claim under the circumstances to determine whether a constitutional violation occurred. *Id.* As discussed at length in the preceding section, the Court finds that Mullins has put forth enough evidence to establish a prima facie case of First Amendment retaliation. Fairly construed in Mullins's favor, the proof shows direct retaliation by the Dean against Mullins (to include isolation, exclusion from project opportunities, ostracism, a threat of firing, undermined relationships, efforts at creating interpersonal division, inaccuracies about employment intent, and, critically, an expressly stated—though falsely hidden—intent to fire) for protected speech. Accordingly, for qualified immunity purposes, Mullins has sufficiently alleged a constitutional violation.

### 2. Clearly Established Right

Under the second prong of the test, Mullins must show that his First Amendment rights in this context were clearly established at the relevant time. "A right is clearly established when its contours are sufficiently clear that a reasonable official would understand that his conduct violates that right." *Id.* at 515 (citing *Anderson v. Creighton*, 107 S. Ct. 3034 (1987)). The "dispositive question is whether the violative nature of particular conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The crux of the inquiry is "whether public officials are on notice that their conduct is unlawful." *Nailon*, 715 F. App'x at 515–16. The Court primarily considers Supreme Court, Sixth Circuit, and this Court's precedent to determine whether a right was clearly established. *Id.* at 515.

Kyrkanides, as discussed previously in this opinion, does not challenge the protected nature of Mullins's speech regarding the Medicaid waiver. Nor does he argue that Mullins's right to speak freely as a private citizen on the Medicaid waiver was not, itself, a clearly established one. Rather, Kyrkanides argues that the law is not clearly established as to whether declining to renew a grant-funded contract constitutes an adverse action because "Mullins simply cannot point to a 'particularized' body of precedent that 'squarely governs' nonrenewal of a contract where all funding supporting the position is expiring and has not been replaced." DE #50 at 5 (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005).

Existing authority would have put a reasonable official on notice that declining to renew Mullins's appointment, even if grant-dependent, because of his protected speech would constitute First Amendment retaliation in these circumstances. *See, e.g.*, *Perry*, 92 S. Ct. at 2698 ("Indeed, twice before, this Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First [] Amendment rights."); *id.* at 2697 (stating that the plaintiff's "right" to continued enjoyment of a government benefit is immaterial to whether that the plaintiff was deprived of that benefit as a result of his protected speech); *Shelton v. Tucker*, 81 S.Ct. 247, 250–251 (1960) (finding that nonrenewal of teachers' whose contracts were "on a year-to-year basis[,]" who were "not covered by a civil service system," and who had "no job security beyond the end of each school year," could not be premised on the teachers' exercising their First Amendment rights).

The Court further recognizes that "[p]ublic officials could 'still be on notice that their conduct violates established law even in novel factual circumstances[,]'" *Nailon*, 715 F. App'x at 515 (quoting *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 417 (6th Cir. 2011)). In view of the existing case law, if the Court accepts as true the disputed, though buttressed, factual

allegations supporting Mullins's characterization of Kyrkanides's motive for declining to renew the appointment, a reasonable official in these circumstances would have been aware of "the violative nature of [his] particular conduct." *Mullenix*, 136 S. Ct. at 308. In other words, taking Mullins's account of facts as true, Mullins has shown that nonrenewal of his contract in retaliation for protected speech would have been a clearly established constitutional violation under these circumstances. Accordingly, Kyrkanides is not entitled to qualified immunity.

Further, and again, the situation is more nuanced and factually complicated than simply the lapse in a renewable contract. Plaintiff alleges—with factual support—that Kyrkanides specifically intended and planned to end his contract because of the speech. Kyrkanides contacted senior UKCOD personnel to seek a plan resulting in Mullins's ouster. Further, per Mullins's theory, Kyrkanides isolated and ostracized him, blocked him from projects and funding opportunities, misled him, and threatened him. Again, Kyrkanides purportedly held the purse strings and had the power to grant or to deny the factual predicates stated in the nonrenewal notice.[11] Under the qualified immunity rubric, the Court must view the facts in Mullins's favor, and those facts go far beyond simply assessing the effect of a grant-funded positional lapse. If Mullins's version is correct, the Dean targeted him and ensured he would have no position at the UKCOD, come academic year 2017–18, because Mullins had engaged in public advocacy over the Medicaid waiver. A jury must sort fact from fiction.

---

[11] Budget decentralization is an issue in dispute. The Dean claims the departments and divisions had control of the budget. *See* DE 49-13 at 69. Other witnesses described that as aspirational and not reality. *See, e.g.*, DE #49-12 at 51 (Cunningham denying decentralization); DE #49-4 at 25 (Kovarik attributing ultimate budget setting to Dean).

### C. Same-Decision Burden-Shifting Defense

In First Amendment retaliation cases, once a plaintiff establishes a prima facie case, "the burden shifts to the defendant, who must show by a preponderance of the evidence that 'the employment decision would have been the same absent the protected conduct.'" *Dye*, 702 F.3d at 307 (quoting *Eckerman*, 636 F.3d at 208). Kyrkanides argues that, regardless of Mullins's Medicaid comments, he would have declined to offer Mullins another contract because of the expiring grant funding and because Mullins indicated he wished to cut down his workload in the coming year. DE #50 at 5–8.

Per *Dye*, in reference to the same-decision framework, "[o]nce this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Dye*, 702 F.3d at 294-95. Factual disputes foreclose summary judgment for the Dean on this theory, and the Court has flagged them already. Mullins has significant evidence that calls for scrutiny into Kyrkanides's role in the funding lapse. Not only did the Dean isolate Mullins from faculty and from projects, Kyrkanides also expressed his intent and plan to end Mullins's role and did so nine months before the academic year end. Further, the Dean claims a lack of budget capacity, but he also concedes that funds would or could have been available if department faculty had simply tried. Given the flat denials of Drs. Raybould, Ebersole,[12] and Cunningham in this regard, the defense plainly fails at this stage. It will be for the jury to decide whether Kyrkanides malevolently orchestrated the end of the Mullins era at UK, or whether the Dean benignly stood by,[13] in support of Mullins and in

---

[12] "Dean Stephanos Kyrkanides . . . told me . . . that Dr. Mullins should be excluded from new public health research projects at [the UKCOD] in the future." DE #49-6 (Ebersole Aff.) ¶ 6.
[13] Dr. Raybould believed the Dean had the power to make reappointment happen, if he so chose. *See* DE #49-9 at 105 ("My experience is, there's always money for things you want to do."). He

hopes of an ongoing relationship. Both versions, which have support in the record, cannot be true. The jury will decide.

## CONCLUSION

For all of the stated reasons, the Court **DENIES** DE #44, except as to any official capacity claim for damages. A jury must hear the competing proof, reach decisions on the etiology of Dr. Mullins's disassociation from the UKCOD, and assign blame, if any, on the claim before the Court.

This the 28th of September, 2018.

Signed By:

*Robert E. Wier*

**United States District Judge**

---

also clearly understood that would not happen. *See* DE #49-16 at 50–51 ("His email said, case is closed. Raynor is not coming back. So I wasn't going to convince him otherwise.").